GILBERT *v.* BANIS

[No. 393, September Term, 1968.]

*Decided October 9, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Donald P. McLaughlin* for appellant.

No brief filed on behalf of appellee.

SINGLEY, J., delivered the opinion of the Court.

This is an appeal from an order of the Circuit Court for Prince George's County, dismissing a bill of complaint filed by Gilbert for the rescission of a contract for sale of Gilbert's house in Accokeek Groves to Banis.

The bill contained two counts: The first alleged that Gilbert was not competent at the time he entered into the contract. The second complained that the contract was too vague and uncertain to be enforceable.

The testimony showed that in July of 1967, Mr. Gilbert, then 81 years of age, called at the office of Mr. Banis, an insurance agent and real estate broker to talk about insuring his house. Banis told Gilbert he wanted to see the property, and two days later Banis went to the property with Gilbert and Gilbert's son. Banis described the conversation:

"* * * At the time I went into the house the

house was vacant. There was a few things laying around; not much of anything. [Gilbert] said he had given most of the things away to his granddaughter. I asked him what he was going to do. He said—he mentioned something about selling. I asked him if I could handle it for him and he said yes.

"Then I made—well, I put up a sign and I called up the next day and asked him if he wanted to sell it to me and he said he would. I made him an offer. Well, I asked him how much he wanted, rather, and he told me.

"Q What did he say, sir?

"A About $8,000.

\* \* \*

"Q And when did you get together again after that?

"A Well, we got together on it, I think it was on the 18th that we got together.

"Q What was the purpose of the getting together at that time?

"A To sign the contract, because over the phone I made him a counter offer of $7,500 for the property. He said that would be acceptable, and I told him I would be down, we would sign the contract. I went down there and I gave him the deposit.

\* \* \*

"Q And you took a contract with you?

"A Yes, I did."

The contract was introduced in evidence. The portion which is germane to the controversy is as follows:

"July 18, 1967

"RECEIVED FROM THEODORE W. BANIS a deposit of ONE HUNDRED AND NO/100 Dollars ($100.00) in the form of CHECK to be applied as part payment of the purchase of Lot

12 in Block in a subdivision of land known as ACCOKEEK GROVES, with improvements thereon (including heating, plumbing, and lighting fixtures, stove and refrigerator, awnings, screens, storm doors and windows, Venetian blinds and shades, as now installed on the premises) known as 15858 LIVINGSTON ROAD, ACCOKEEK, P.G., COUNTY, MARYLAND upon the following terms of sale: Total price of property SEVEN THOUSAND FIVE HUNDRED AND NO/100 Dollars ($7,500.00) The purchaser agrees to pay ONE THOUSAND AND NO/100 Dollars ($1,000.00) cash at the date of conveyance, of which sum this deposit shall be a part.

"The Purchaser is to PLACE a first deed of trust secured on said premises of $6,500.00 due ......... ............ ... and bearing interest at the rate of SIX per cent per annum, payable $65.00 PER MONTH

SELLER TO TAKE BACK 1st TRUST
T.W.B., R.T.G.

"The balance of deferred purchase money amounting to $ NIL is to be secured by a NIL deed of trust on said premises to be paid in monthly installments of $ NIL or more, at maker's option, including interest at the rate of NIL per cent per annum, each installment, when so paid to be applied, first, to the payment of interest on the amount of principal remaining and the balance thereof credited to principal, which deed of trust the Sellers agree to accept as a part of the purchase price, in case of default in any payment, the entire amount then remaining unpaid, shall immediately become due and payable. Trustees in all deeds of trust are to be named by the parties secured thereby."

The text of the contract was either printed or type-written, except for the phrase "Seller to take back 1st trust" which was handwritten and initialled "T.W.B., R.T.G." Mr. Banis explained this:

"Q And you are saying that this written notation 'seller to take back first trust,' * * * was written at the same time and on the same day?

"A Yes, sir. It was written on the 18th of July at the home of Mr. Gilbert.

"Q Now, was there some conversation at that time which led up to making this notation?

"A No. On this—this was done at the—this was done over at his home in Accokeek. We discussed that, and I told him I probably would have a little difficulty then getting money to finance it, and I asked if he was willing to take back a trust on it and he said—well, he said, 'It all depends. What per cent?' I told him, 'Six' and he said, 'That will be fine.'

"Q So, the original contract you took to the house contained the notation 'the purchaser is to place a first deed of trust,' and you are saying that after you arrived at Mr. Gilbert's apartment you made the notation 'seller to take back first trust'?

"A Yes, because I failed to type it in and I just put it in by hand."

The chancellor found no evidence to support Gilbert's claim that he was incompetent at the time the contract was entered into. This is not challenged on appeal. What is questioned is the finding that the contract is neither so vague nor so uncertain as to be unenforceable.

It is argued in Gilbert's behalf that the provisions of the contract which purport to provide for the payment of the deferred purchase price leave important questions unanswered: What portion of the principal debt is the deed of trust to secure? Upon what property is the lien

to attach? What provisions in case of default shall apply? And, how, and by whom are payments of taxes and insurance to be made?

We regard as misplaced Gilbert's reliance on a series of our prior decisions which have held contracts for the sale of real estate unenforceable because of uncertainties or ambiguities for, as will be later developed, in each of them there was a patent ambiguity, apparent on the face of the contract, which could not be explained by parol.

What we are dealing with in the case before us is an agreement with respect to financing, inexpertly drawn to be sure, which Gilbert finds unacceptable not because of what it states, but because of what it omits. To us, it requires no strained interpretation to conclude that by the insertion of the handwritten clause, Gilbert agreed to take back a first trust of $6,500, secured by a lien on the premises, to be paid at the rate of $65 per month accounting from the date of settlement, the monthly payments to be applied first to the payment of interest at the rate of 6% on the unpaid balance of principal, and the remainder to be applied to the reduction of the principal of the debt until the debt should be paid in full. Had the third paragraph of the printed form, intended to provide for purchase money debt, been utilized this would have been abundantly clear. That the parties chose a simpler approach does not, under the criteria set forth in our decisions, clothe the transaction with invalidity.

Maryland Code (1957, 1966 Repl. Vol.) Art. 21, §§ 68 ff. provide forms "sufficient to convey real or personal property." § 71 sets forth the form of a deed of trust "to secure debts * * *":

> "This deed, made this ..... . . day of ............,
> in the year . . ......., by me, ................... . .............,
> witnesseth, that whereas (here insert the consideration for making deed,) I, said .... .........,
> do grant unto ..... . ..........................., as trustee,
> the following property, (here describe the property,) in trust for the following purposes (here

insert the purposes of the trust, and any covenant that may be agreed upon).

"Witness my hand and seal.

"Test:                                        [SEAL.]"

A.B.

More elaborate provisions may be, and customarily are, inserted by agreement of the parties; but the fact that they fail or neglect to do so casts no cloud on the effectiveness of the lien.

A substantially similar question was disposed of in *Quillen v. Kelley,* 216 Md. 396, 140 A. 2d 517 (1958), where the contract provided for the sale of property for $257,500, of which a specified portion was to be paid in cash, the balance to be represented by "bills obligatory" secured by "purchase money mortgage, mortgage bill of sale or such other instrument as may be necessary * * * to secure said bills obligatory." Judge (later Chief Judge) Prescott, speaking for the Court, rejected the purchasers' contention that the agreement of sale was so vague, ambiguous and indefinite that it was void:

> "It needs little, if any, citation of authority to sustain the statement that if an agreement be so vague and indefinite that it is impossible to collect from it the full intention of the parties, it is void, *Strickler Eng. Corp. v. Seminar,* 210 Md. 93, 101, 122 A. 2d 563, *Robinson v. Gardiner,* 196 Md. 213, 217, 76 A. 2d 354, and the vendee is entitled to a refund of any payments made upon the purchase price. *Globe Home Impvt. Co. v. Brothers,* 204 Md. 73, 74, 102 A. 2d 748. But courts are reluctant to reject an agreement, regularly and fairly made, as unintelligible or insensible. The agreement will be sustained if the meaning of the parties can be ascertained, either from the express terms of the instrument or by fair implication. The law does not favor, but leans against the

destruction of contracts because of uncertainty; therefore, the courts will, if possible, so construe the contract as to carry into effect the reasonable intention of the parties if that can be ascertained. *Middendorf, W. & Co. v. Milburn Co.*, 134 Md. 385, 387, 388, 107 A.7. Cf. *Trotter v. Lewis,* 185 Md. 528, 45 A. 2d 329; *Schloss v. Davis,* 213 Md. 119, 131 A. 2d 287.

\* \* \*

"The appellants further argue that the agreement fails to state the terms and conditions of the purchase money mortgage and what amount of insurance on the property must be carried by the vendees, and these facts are fatal to its validity under the ruling of this Court in *Applestein v. Royal Realty Corp.,* 180 Md. 274, 23 A. 2d 684. That case dealt with what the Court considered an ambiguous clause in a contract relative to the payment of principal under a mortgage required to be given by a contract of sale of real estate. The Court concluded that this clause contained inconsistent requirements; but, when the case again came to this Court, 181 Md. 171, 28 A. 2d 830, it was held that parol evidence and the proof of custom and usage were admissible to clear up the ambiguity. The opinion in the first case, 180 Md. at page 277, specifically pointed out that covenants to be placed in a mortgage, when they go beyond providing for the mere creation of a lien, are necessarily the subject of agreement between the parties; that matters such as whether the interest is to be paid annually, who is to be obligated to pay the taxes, or that the buildings should be insured are not essentially involved in a valid mortgage; and, if the contract between the parties be silent on such points, a provision therein for the execution of a mortgage is fully complied with by the execution of a mortgage con-

taining no such covenants. See also *Hartsock v. Mort,* 76 Md. 281, 291, 25 A. 303. Compare *Triebert v. Burgess,* 11 Md. 452; *Caplan v. Buckner,* 123 Md. 590, 91 A. 481; *Fifer v. Hoover,* 163 Md. 381, 163 A. 848; *Rocklin v. Eanet, supra,* 200 Md. 358.

"Of course, if an attempt be made in the agreement of sale to set out a term or terms of a mortgage provided for therein such must be done by clear, definite and certain language; but additional terms, not essentially involved in creating the mortgage or lien, are not prerequisite to the agreement being clear and definite. If additional terms have been agreed upon, they, unquestionably, should be included in the contract, *Kikas v. Baltimore County,* 200 Md. 360, 365, 89 A. 2d 625; but, simply because additional terms have not been agreed upon does not, of itself, render the contract vague and uncertain. * * *" 216 Md. at 407-09.

Less than a week after the decision in *Quillen v. Kelley,* Chief Judge Brune filed the Court's opinion in *Baker v. Dawson,* 216 Md. 478, 141 A. 2d 157 (1958), portions of which are equally relevant:

"*Indefiniteness as to the Terms of the Deed of Trust.* The absence from the contract of many usual terms found in deeds of trust or mortgages, such as covenants to pay taxes or insurance (the latter of which appears of trifling importance in this case) and provisions with regard to foreclosure is not fatal.

\* \* \*

"In many respects a deed of trust is a mortgage (*Manor Coal Co. v. Beckman,* 151 Md. 102, 133 A. 893), but in some respects there are differences. (*LeBrun v. Prosise, supra.*) [197 Md. 466]. Recently, they have been brought more closely into line with each other through extend-

ing the same priorities to a purchase money deed of trust as to a purchase money mortgage. (Acts of 1955, Ch. 369, effective shortly before the contract here involved was made; Code (1957), Art. 66, Sec. 4.)

"Some terms of the deed of trust are spelled out. It is to be on the premises sold and is to secure an aggregate of $29,000, payable 'on or before' eleven years from date of settlement, with interest at the rate of 5% per annum, and 'payable $2,000 or more each year, plus interest.' In addition, there are the release provisions set forth in Schedule A, and any amounts paid pursuant to those provisions are, we think, to be in addition to the minimum payments of $2,-000 a year. Any balance remaining unpaid at the end of eleven years is then due. All of these provisions can readily be covered by the deed of trust, and we find no inconsistency between them. This case falls under the second decision (based upon an amended declaration) in *Applestein v. Royal Realty Corporation,* 181 Md. 171, 28 A. 2d 830, rather than under the first decision in that case which is reported in 180 Md. 274, 23 A. 2d 684. See also *Quillen v. Kelley,* 216 Md. 396, 140 A. 2d 517.

"Another term of the contract relating to the deed of trust can readily be met—that the trustees shall be named by the persons secured, the Dawsons. The contract shows that the deed of trust is to secure a part of the purchase price, and the deed of trust should so state.

"We should have no doubt that if the question presented was whether or not a deed of trust in some particular form was in conformity with the contract, it would be found to be so if it were in any form in general use in Montgomery County. That, however, is not the precise question before us, and no actual form of deed

of trust has been tendered by the purchaser or offered in evidence. Doubtless such a form could readily be procured, and the appellant has expressed a willingness to execute any such form in use by the title company handling the settlement. The appellees, however, have rejected any such offer and stand on their contention that the contract as drawn is too indefinite to be specifically enforced and say that there is no proof of any customary form. A consequence of this position may be that they will wind up with a less desirable instrument than they could easily have had for their own protection. If they should find themselves in that position, it would seem that they would simply have to take what the contract calls for. *Hartsock v. Mort,* 76 Md. 281, 291, 25 A. 303; *Quillen v. Kelley, supra.*

"They point out the absence of any foreclosure provisions, and it is certainly true that no default clauses with a power of sale exercisable upon default are spelled out. It may also be quite true, as they contend, that there is no one standard or customary form of deed of trust in general use in Montgomery County dealing with such matters. However, we think that there is no serious difficulty in inferring from the terms of the contract a right of foreclosure which the beneficiaries of the trust may enforce in the event of default in the payment when due of any of the sums, principal or interest, specified in the contract. In *Manor Coal Co. v. Beckman, supra,* there was a deed of trust in the nature of a mortgage which had been executed to secure bonds issued by a coal company. The holders of a majority of these bonds exchanged them for bonds of another coal company. The holders of a minority of the bonds called upon the trustee under the deed to exercise the power of sale conferred thereunder, which the trustee

refused to do. This Court held that the minority bondholders could enforce their lien in a court of equity under its general chancery jurisdiction. A deed of trust such as is provided for here is just what this Court declared the deed of trust in the *Manor Coal Co.* case to be: a conveyance of land as security for a debt. The addition of a power of sale did not change its character any more than the addition of a power of sale changes the character of a mortgage. (See 151 Md. at 115.) Quite possibly, as stated in *Jones on Mortgages*, 7th Ed., Secs. 358, 1134, the sellers could protect themselves against loss through any failure of the purchaser to pay taxes by paying the taxes themselves and obtaining reimbursement out of the proceeds of sale, and by subrogation they could maintain a priority over junior incumbrancers, if there were any. Cf. *Young v. Omohundro,* 69 Md. 424, 16 A. 120." 216 Md. at 492-95.

Unfortunately, no brief was filed for Banis in this case, so we can only surmise what position the appellee might take. We regard *Quillen v. Kelley* and *Baker v. Dawson,* neither of which was cited or distinguished by the appellant, as controlling the issue before us. On the other hand, the cases cited by Gilbert are readily distinguishable as inapplicable to the situation at hand.

Gilbert placed his principal reliance in his brief and argument before us on *Tarses v. Miller Fruit & Produce Co.,* 155 Md. 448, 142 A. 522 (1928) ; *Applestein v. Royal Realty Corp.,* 180 Md. 274, 23 A. 2d 684 (1942) ; *Applestein v. Royal Realty Corp.,* 181 Md. 171, 28 A. 2d 830 (1942) ; *Smith v. Biddle,* 188 Md. 315, 52 A. 2d 473 (1947) ; *Standard American Homes, Inc. v. Pasadena Bldg. Co.,* 218 Md. 619, 147 A. 2d 729 (1959) ; *Silverman v. Kogok, Adm'r,* 239 Md. 71, 210 A. 2d 375 (1965) ; and *Manning-Shaw Realty Co. v. McConnell,* 244 Md. 579, 224 A. 2d 445 (1966).

With the possible exception of the *Applestein* cases, which must be read together and will be treated separately, all are distinguishable on their facts, since all involved instances of patent ambiguities, apparent on the face of the contracts, which could not be corrected by parol.

In *Tarses,* the contract, which was for the sale of three leasehold lots for $9,200, called for a deposit of $500 and then provided, "Vendor agrees to take back a second mortgage of one thousand ($1,000) dollars for one year \* \* \*." The Court affirmed a denial of specific performance on the ground that the contract was "incomplete and uncertain in material matters" since the property to be subjected to the second mortgage was not identified, and if the property which was the subject of the contract was intended, no limit was placed on the amount of a prior encumbrance which the purchaser might put on the property.

In *Smith v. Biddle,* the purchase price was $4,000, of which $500 was a down payment, and the balance was to be paid by "a mortgage or mortgages to be arranged by the vendor on a building and loan association plan without bonus." The Court held the contract "too vague and indistinct" to be the subject of specific performance, because neither the terms, the interest rates nor the amortization provisions of the "mortgage or mortgages" were spelled out.

In *Standard American Homes,* the seller agreed to sell to the buyer certain lots in one development for $850 each and certain lots in another development for $800 each, and to convey the first six lots in each development without payment of the purchase price, but to accept instead such purchase money mortgage as would "allow the [buyer] to obtain a construction mortgage." When the buyer sought specific enforcement of the agreement, this Court, speaking through Judge Horney, said, "The terms of the agreement relating to the purchase money mortgage are also vague and uncertain. \* \* \* In this instance none of the terms usually specified — time, mode and

terms of payment, including rate of interest—are even mentioned." 218 Md. at 626.

In *Silverman v. Kogok,* the somewhat attenuated contract, characterized by the Court as a "scribbled agreement" provided for the sale of 18,300 square feet of land at 90¢ a square foot and continued "[o]wner to receive $2,800.00 cash above real estate commission. Balance of purchase money payable $100.00 per month * * * 6% interest. Due in full in five years." The lower court refused to grant the buyer specific performance. In affirming the result on appeal, Judge Oppenheimer, speaking for this Court, said:

> "It is not stated, and cannot be determined from the fragmented phraseology, when the interest is to be paid, or whether the $100 per month to be paid on the balance of the purchase money is to include the interest. The total purchase price, at $.90 a square foot, would be $16,470, of which only $2800 was to be paid in cash. Interest on the remainder would be over $800 a year; the first month's interest would be approximately $68. Under the circumstances, in a five year contract, whether the seller is to receive $100 or $168 for the first month, with similar (if gradually less) possible differences for the remainder of the contract cannot be deemed immaterial. The contract is too indefinite, uncertain and ambiguous to be specifically enforceable." 239 Md. at 77-78.

Finally, in *Manning-Shaw,* we found a contract unenforceable for the reasons given in *Silverman.* In *Manning-Shaw,* a leasehold was sold for $6,000, of which $400 was paid as a deposit. The agreement then provided:

> "Balance in cash on date of settlement as follows: A $4,000.00 mortgage to Parkwood Building and Loan Association, payments on which

are not to exceed $18.00 per week, and a second mortgage in the amount of $1600.00 to the sellers, for five years, with interest at six per cent, payments not to exceed $3.00 per week."

It was the readily apparent ambiguity in the arithmetic relating to the second mortgage which vitiated the agreement.

The case of *Trotter v. Lewis*, 185 Md. 528, 45 A. 2d 329 (1946) is also of little help to the appellant. This case involved an agreement which leased certain lots for five years at $20 per month and gave the lessee during the term of the lease "an option on sale of said premises * * * price not to exceed $2,500, with interest not to exceed 6% per annum." During the term, the optionee tendered $2,500 but the optionor refused to convey, and resisted an action for specific performance on the ground, among others, that the contract failed to include a clause covering partial payments. Our predecessors disregarded the interest provision and treated the agreement as one to sell for $2,500 cash during the term of the lease, but in passing pointed out that a contract providing for deferred payments would not be specifically enforceable if the time for payment is not specified.

Other instances of the minimum requirements necessary to support specific performance of a contract providing for financing can be found in *Grooms v. Williams*, 227 Md. 165, 175 A. 2d 575 (1961) ; *Fett v. Sligo Hills Dev. Corp.*, 226 Md. 190, 172 A. 2d 511 (1961) ; *Vary v. Parkwood Homes, Inc.*, 199 Md. 411, 86 A. 2d 727 (1952) and *Beck v. Bernstein*, 198 Md. 244, 81 A. 2d 608 (1951).

We regard the appellant's reliance on the *Applestein* cases as misplaced. The first of them, *Applestein v. Royal Realty Corp.*, 180 Md. 274, 23 A. 2d 684 (1942) was an appeal from an order overruling a demurrer. The case involved a contract for the sale of two properties for $10,-000, of which $500 was represented by a deposit, $1,500 was to be paid in cash at the time of settlement, and the balance was to be secured by "a purchase money mort-

gage of eight thousand dollars ($8,000.00) for a period of five years to bear interest at four per cent (4%) per annum. Said mortgage to be amortized ten per cent (10%) annually, to be paid monthly or quarterly."

When the seller sought specific performance, the purchaser demurred on the ground that the contract was vague, indefinite and uncertain. The lower court overruled the demurrer, and we reversed, holding that the demurrer should have been sustained with leave to amend. Judge Sloan, speaking for the Court, recognized what might be regarded as a patent ambiguity in the contract:

> "The inconsistent requirements are that the mortgage shall be payable in five years, yet the agreement also says it is to be amortized 10 per cent. annually. To be amortized at that rate, the mortgage should be payable in ten years, not five. The courts must say what the contract is, yet in this one clause, we have two contracts, one calling for a five year mortgage and one for ten years. To say that it shall be one, or the other, would mean that the court write in the provision for payment." 180 Md. at 276.

Less than a year later the case was again before this Court, again from an order overruling the purchaser's demurrer to the seller's amended bill of complaint. *Applestein v. Royal Realty Corp.*, 181 Md. 171, 28 A. 2d 830 (1942). On the second appeal, the order overruling the demurrer was affirmed and the appeal dismissed. In its amended bill of complaint the seller had alleged that by custom and usage, in Baltimore City, certain covenants were incorporated in all mortgages, and that the ambiguity in the mortgage terms which troubled the court on the first appeal was a latent one: that by custom, a 10% amortization provision in a mortgage for five years meant that 50% of the principal of the mortgage debt would be due and payable at the end of five years. The Court concluded that the agreement contained a latent ambiguity, which could be explained by parol,

and that the contract was susceptible of specific enforcement.

Gilbert, in brief and argument relied heavily on the first *Applestein* case, but misconstrues the second, completely overlooking Judge Prescott's analysis of the effect of the two cases, read together, which appears in his opinion in *Quillen v. Kelley, supra.*

All of the cases cited by appellant to support his contention that his agreement was unenforceable because of uncertainty involved patent ambiguities which appeared on the face of the writing itself. *Stokeley v. Gordon,* 8 Md. 496 (1855). In the instant case, any possible ambiguity is latent: in other words, the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings. *Stokeley, supra.* In the case before us, the only possible uncertainty is the term of the mortgage, which can be easily determined by resorting to readily available tables relating to monthly reduction loans. In Gilbert's case, a $6,500 loan at 6%, payable in monthly installments of $65 will be fully amortized in 11 years and seven months. See *Financial Constant Per Cent Tables* (1958) No. 87 at 82. Banis testified that it was "about a little better than eleven years."

From what we have said, we are persuaded that the agreement between Gilbert and Banis was sufficiently certain to have been specifically enforceable by either of them absent an element of laches or of other defense not before the lower court. Consequently, Gilbert's bill for rescission was properly dismissed.

*Order affirmed; costs to be paid by appellant.*